**John McGLOTHLIN, Plaintiff,**

v.

**Edward MURRAY, et al., Defendants.**

**No. CIV.A. 93–0981–R.**

United States District Court,
W.D. Virginia,
Roanoke Division.

Feb. 13, 1997.

John Patton McGlothlin, Bland, VA, pro se.

Pamela Anne Sargent, Asst. Attorney General, Richmond, VA, Rosalie Pemberton Timberlake, Smith Thomas & Moses, Staunton, VA, for Defendant.

## ORDER

MICHAEL, Senior District Judge.

After conducting a plenary hearing in the above-captioned case, United States Magistrate Judge B. Waugh Crigler issued a thorough and comprehensive forty-seven page Report and Recommendation in which he set forth factual findings, legal conclusions, and recommendations to this court. The Magistrate determined that plaintiff had failed to prove his claim of religious discrimination and recommended that this court dismiss plaintiff's case. Plaintiff's only objections to the Magistrate's Report come in the form of a letter, addressed to the Magistrate Judge. A letter addressed to the Magistrate Judge does not qualify as a proper means of lodging objections to a Report and Recommendation. Plaintiff in this case is well-versed in litigation matters and is, or should be, fully aware that objections should not be filed in this manner. Nonetheless, because courts should generally exercise caution before sanctioning pro se prisoners for failing to comport their motions to the appropriate form, the court will treat plaintiff's letter as though it were a properly filed motion.

After reviewing plaintiff's objections and examining the case de novo, the court adopts the Magistrate's Report.

For the reasons stated in the Report and Recommendation issued by United States Magistrate Judge B. Waugh Crigler on January 28, 1997, it is this day

## ADJUDGED AND ORDERED

as follows:

(1) The Report and Recommendation issued by United States Magistrate Judge on January 28, 1997, shall be, and it hereby is, adopted.

(2) Plaintiff's objections shall be, and they hereby are, overruled.

(3) This case shall be, and it hereby is, dismissed and stricken from the docket of this court.

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record, to pro se plaintiff, and Magistrate Judge B. Waugh Crigler.

## REPORT AND RECOMMENDATION

CRIGLER, United States Magistrate Judge.

Plaintiff, an inmate at Dillwyn Correctional Center ("Dillwyn") and, as conceded by defendants, a Sunni Muslim, filed this action under 42 U.S.C. § 1983 claiming that defendants violated his First Amendment right to the free exercise of religion and his Fourteenth Amendment right to equal protection in that he was treated differently than inmates of other faiths while incarcerated at Staunton Correctional Center ("Staunton") and at Dillwyn. The Hon. Jackson L. Kiser, Chief United States District Judge, granted summary judgment on some of plaintiff's claims, but denied summary judgment on the following claims:

(1)(a) The state provided a smaller bulletin board for the Orthodox Muslims than for the Christians at Staunton Correction Center, and then money from the chaplain's fund was used to render improvements to the Christian bulletin board, thereby making it more lavish.

(1)(c) Plaintiff, as secretary for the Sunni Islam, had to use his own money for paper to make announcements because his requests for paper from the chaplain's office were refused, while Christians' activities were announced on paper supplied by the chaplain's office.

(1)(d) The chaplain's fund was only used for Christian activities, despite the fact that the monies came from all inmates regardless of their faith.

(1)(e) Chaplain Roepke supervised an inmate who was paid by the state but

who nevertheless worked strictly on Christian projects.

(1)(f) Chaplain Roepke denied plaintiff use of a typewriter on at least two occasions but allowed Christian inmates to use the typewriter whenever they wanted to use it.

(1)(g) Chaplain Roepke denied him photocopies while providing copies for Christians.

(1)(h) The inmate supervised by Chaplain Roepke had a nice office in which to work, while plaintiff had to work from his own cell.

(1)(I) Chaplain Roepke refused to let Orthodox Muslims display their literature in his office despite numerous requests.

(1)(j) Chaplain Roepke refused to provide letters of reference to Orthodox Muslims, despite having provided the same service for Christian inmates.

(1)(k) Christian services were always announced on the public address system, while plaintiff had to personally announce Sunni Islam services to members because these services were rarely announced over the public address system. (This claim remains against the institutional defendants only.)

(1)(*l*) Chaplain Roepke saw to it that all requests by the Christians for extra time in the chapel were granted, but he refused any requests by plaintiff for extra time.

(1)(p)(ii) Plaintiff has been denied access to a Koran while in protective custody at Dillwyn Correctional Center. (This claim remains against the institutional defendants only.)

(1)(p)(iii) Chaplain Austin, at Dillwyn, has refused to talk to plaintiff about the denial of the Koran or to counsel him otherwise.[1] (This claim remains against the institutional defendants only.)

(2)(a) Both Chaplain Roepke and Chaplain Austin, who have access to an office and an assistant supplied by the state, view Orthodox Muslims as potential converts and freely express this view.

(2)(b) While at Staunton and Dillwyn, plaintiff did not have access to an Orthodox Muslim chaplain, Chaplains Roepke and Austin ignored him, and Sunni Islam volunteers were refused permission to counsel inmate members of the faith.

(6)(a) Staunton kept lists of inmates with Korans as a method by which prison staff could monitor Orthodox Muslims and harass them, even though no lists were kept of inmates with Bibles or Torahs. (This claim remains against the institutional defendants only.)

(6)(b) May D. Campbell directed him to compile a list of those inmates with Korans so that the administration could monitor and harass Orthodox Muslims.

(6)(c) Only Orthodox Muslims were required to get passes to go to services which are held in another building because the chapel is unavailable to them.

(8)(a) Staunton refused to acknowledge prayer beads and other Islamic Holy symbols, but Christians are allowed to have their crosses and beads. (This claim remains against the institutional defendants only.)

(11)(c) Hearings officer refuses to name a Sunni Islamic advisor although regulations require her to keep a list of "qualified advisors." (This claim remains against the institutional defendants only.)

The case then was transferred to the Hon. James H. Michael, Jr., presiding District Judge, by Order entered on August 7, 1996. In turn, Judge Michael referred the case to this court by Order entered on August 15,

---

1. Chaplain Austin was named as a defendant, but plaintiff was unable to serve him with process within 120 days of filing the complaint. Thus, on July 9, 1996, Austin was dismissed without prejudice from the action.

1996 under authority of 28 U.S.C. § 636(b)(1)(B) to conduct proceedings and to render a report setting forth appropriate findings, conclusions, and recommendations for disposition. A plenary hearing was held on November 12 and 13, 1996, in consequence whereof this Report and Recommendation issues.

*STATEMENT OF THE CASE*

*Plaintiff's Testimony*

Plaintiff testified that he practices the al-Islam faith and belongs to a community that adheres to Sunni Islam. Plaintiff described the tenets of his faith, and stated that the only physical item that was absolutely necessary for the practice of his faith was access to a Koran. He noted that Muslims such as himself also regard the Bible and the Torah as holy and consider having prayer beads and a prayer rug as desirable, but not essential. According to plaintiff, the practice of faith and not the use of faith objects is at the core of Islam. Having said this, plaintiff then directed his testimony to each of his remaining claims in turn.

As to his claim that the state provided the Christians at Staunton a bigger and better bulletin board than the Muslims were provided, plaintiff testified that the real problem was not the size of the bulletin boards but that the Muslims' bulletin board was often vandalized. The Christian Fellowship was able to use the Chaplain's Fund, funds the Christian Fellowship raised in their picture project, to have their bulletin board covered with glass to avoid vandalism. The Muslim group did not participate in the Christians' fund raiser, but conducted their own fund raisers. Plaintiff testified that funds from the Muslim account were never used to improve their bulletin board because the group never obtained permission to do anything to the board. Plaintiff asserted that he requested permission to improve the Muslim bulletin board first from Chaplain Roepke in June 1993, then from Major Jack, the Chief of Security. Plaintiff stated his requests to Chaplain Roepke were both written and oral, even though plaintiff was unable to produce a copy of his written requests. He stated they were included in the records that were lost when he was transferred from Staunton to Dillwyn. At first he and the Muslim community asked that the improvements to their bulletin board be paid for from the Chaplain's fund, but then they offered to spend their own funds on the project. In support of his claims, plaintiff offered into evidence a letter addressed to Warden John Taylor, dated July 9, 1993, that mentioned the bulletin board discrepancy. (Pltf.Ex. 5). He also offered a July 9, 1993 letter to Ed Murray, Director of VDOC, referring to the letter to Taylor (Pltf.Ex. 6), and the December 10, 1994 letter to Mr. Mahon, the warden at Dillwyn, informing him of his missing files. (Pltf.Ex. 7).

Plaintiff also addressed his claim that he was forced to use his own money for paper to make announcements for the Muslim community. According to what the chaplain's clerks told plaintiff, the Christians' activities were announced on paper supplied by the Chaplain's office, which paper was purchased by the state. Plaintiff testified that the Muslim community would use its own money to purchase paper, but when that money was depleted, plaintiff was required to use his personal funds to buy paper. He viewed his use of personal funds as a contribution to his faith.

Plaintiff offered that the Chaplain's fund was used for Christian activities only, even though the money came from all inmates. Upon further examination, he explained that the purpose of the fund was to provide financial aid for funerals, flowers, death bed visits, and other good works when a Christian inmate or his family was ill or suffered a loss. The basis for plaintiff's contention that the chaplain's fund represented monies paid by all inmates is that it was financed by what was called the "Picture Project." This was an organized effort by the Christians to take pictures of inmates, for a fee, so inmates could keep them or send them home. Plaintiff admitted, however, that he never personally requested use of any money from the Chaplain's fund.

Plaintiff next addressed his claim that Chaplain Roepke supervised an inmate who was paid by the state but who worked only on Christian projects. He testified that all but one of the clerks over the years he was

incarcerated at Staunton were Protestant Christians. He noted that one Muslim inmate, Randolph Robinson, was appointed the clerk, but only after this lawsuit was filed. That clerk, like all the others, worked only on Protestant Christian projects—preparing announcements for Christian activities and maintaining the library, for example. Plaintiff admitted, however, he never applied to work in the Chaplain's office.

Plaintiff also commented on his claim that Chaplain Roepke denied plaintiff the use of the typewriter that was located in the chaplain's office, while allowing Christian inmates to use it at will. Plaintiff testified that in April 1993 his typewriter broke. He was not allowed to do personal work on the typewriter in the law library where he worked, and Chaplain Roepke told him the typewriter in his office was only for the clerks who worked in the treatment department, which included the chaplain's office, and it was not for use by inmate groups, such as the Muslims.

Plaintiff also elaborated on his claim that Chaplain Roepke denied him free photocopies while providing them for Christians. For two years, plaintiff roomed with the leader of the Christian fellowship. This inmate often brought in stacks of copies he believed were run off in the Chaplain's office. Plaintiff also testified that inmate Robinson, the Muslim who held the position of chaplain's clerk at one time, told plaintiff that he saw copies being made for the Christian Fellowship. He testified that over the course of two years he made at least three personal requests and numerous written requests to Chaplain Roepke for photocopies. Plaintiff needed the copies to post announcements of Muslim services in each housing unit and to make copies of brief summaries of the Muslims' Friday services. He requested at least one hundred copies a week. Plaintiff acknowledged that the imams of the Muslim community may have gotten some copies through Ms. Campbell's office.[2] The inability to obtain photocopies to announce the Muslim services and to summarize the Friday services affected plaintiff personally in that he had to make the copies on his typewriter.

Plaintiff also noted the disparity in the working conditions between himself as secretary to the Muslim community and Chaplain Roepke's clerk. Plaintiff had to do his work for the Muslims on his bunk in his cell, whereas the Chaplain's clerk did the same activities for the Christians at a desk in an air conditioned office with a typewriter and other supplies provided at state expense. Plaintiff asserted that he could not perform the job as well in a cell as he would have been able to do in an office setting. Plaintiff admitted that he never held the position of Chaplain's clerk, that he never applied for it, and that he had no desire to hold that position.

McGlothlin also explained his claim that Chaplain Roepke refused to allow Muslims to display their literature in his office. Plaintiff testified that he made personal requests to display Muslim literature in the Chaplain's office. Although plaintiff was allowed to put a sign on the chaplain's office door during the Friday Muslim services, he expressly desired to display a permanent sign with the Muslim community's name on the Chaplain's office door. The denial of this request personally offended plaintiff and made him angry.

As to his claim that Chaplain Roepke refused to provide letters of reference to Muslims, plaintiff admitted that the Chaplain also refused to provide such to Christians who never made a personal request for a reference letter.[3]

Plaintiff also elaborated on his claim that the prison administration failed to announce Muslim services over the public address system. He explained that Staunton had a public address system, and that religious services generally were announced over it. The system was part of VDOC hardware and staffed by VDOC employees. Plaintiff made requests that the Muslim community's Friday Jumu'ah services be announced over the public address system. They were announced occasionally, but not always. When

---

**2.** The evidence showed that the Chaplain's office was part of the Treatment Department of which Ms. Campbell was a staff member.

**3.** Plaintiff presented no other evidence related to this claim.

plaintiff asked why their services were not always announced, he learned from Major Jack that the announcements would be made unless security concerns at the time prohibited it. Plaintiff further offered into evidence a September 23, 1993 letter to Ed Murray in which plaintiff noted his concerns about the use of the public address system. (Pltf.Ex. 9).

Plaintiff also addressed his claim that Chaplain Roepke helped Christians secure extra time in the chapel but refused requests by Muslims for extra time. The Muslim community held its Friday Jumu'ah service in the Treatment Building. Attempts to use the chapel for Friday services were unsuccessful. It was explained to plaintiff that the chapel was not open on weekdays because there would have to be another officer assigned to the chapel. When plaintiff pointed out that the chapel was often open for special services during the week, that fact was dismissed as irrelevant.

When plaintiff asked Chaplain Roepke for help in securing the chapel for Friday services, the chaplain responded that he was not in charge of scheduling. Plaintiff was under the impression, however, that Chaplain Roepke was in charge of scheduling religious services. Plaintiff admitted he possessed no first-hand knowledge that Chaplain Roepke ever requested extra chapel time from security for the Christian Fellowship.

Plaintiff stated that he felt that the Muslims were forced to have their Friday services in the Treatment Building instead of the chapel because prison officials wanted to intimidate them. Prisoners were required to get a pass to attend any function in the Treatment Building but not the chapel. Plaintiff noted, however, that he never failed to attend a service for lack of a pass, and that the injury to him simply was his dislike for having to obtain a pass to attend religious services.

Plaintiff also discussed his claim that while in protective custody at Dillwyn he was denied access to a Koran. He stated that when he arrived at Dillwyn he was placed into special housing. Upon arrival, plaintiff requested a Koran. He testified that he was denied a Koran but offered a Bible instead.

Plaintiff also explained the incident underlying his claim that Chaplain Roepke viewed Muslims as potential converts to Christianity. He related that he was called into the chaplain's office because a Christian prisoner had complained to security when Muslims told him not to proselytize to Muslims. Plaintiff testified that the chaplain stated that Muslims were lost souls.

Plaintiff also testified regarding his claim that he had no access to a Muslim chaplain, that Chaplain Roepke ignored him, and that Muslim volunteers were refused permission to counsel Muslim prisoners. Plaintiff believed that the Chaplain's Service had a duty to secure religious volunteers in the prisons. Plaintiff testified that he had made efforts to secure volunteers to come into the prisons for the Muslims. He also noted that during his incarceration at Staunton, no Muslim volunteers were secured to come into the prison through the chaplain's office. Some Muslim volunteers were arranged through the office of Ms. Campbell, the volunteer services coordinator. Two of the volunteers Ms. Campbell secured were imams who led the community in prayer and one was a Yemeni national who taught on the Muslim faith. Plaintiff claimed harm as a result of the absence of volunteers because he believed he needed someone to teach him more about Islam.

Plaintiff also addressed his claim that while he was at Staunton, he was directed by Ms. Campbell to compile a list of inmates who possessed Korans, but inmates with Bibles or Torahs were not similarly recorded. Plaintiff testified that Ms. Campbell simply explained to him that policy required the list be made. Plaintiff refused to comply with her request to compile the list.

Plaintiff elaborated on his claim that the fact that Muslims were required to hold their Friday services in the Treatment Building at Staunton impaired his free exercise of religion. The Treatment Building is a secured area, and, thus, prisoners were required to obtain a pass to go to that building for any reason. On one occasion, plaintiff tried to attend Friday services without a pass but was refused and advised to get a pass if he wanted to go. Plaintiff secured a pass, and

then was allowed to attend services. Plaintiff conceded he never was denied a pass to the Treatment Building to attend Friday services.

Plaintiff's claim that he was not allowed to have prayer beads at Staunton is based solely on the fact that his prayer beads disappeared during his transfer from Staunton to Dillwyn. In essence, this is a claim for loss of personal property.

As to plaintiff's claim that the hearings officer refused to name a Muslim inmate advisor, plaintiff testified that he applied for the position of inmate advisor at the suggestion of his Muslim community at Staunton. The advisor is assigned to help other inmates during disciplinary proceedings. Plaintiff testified that he knew he would have to be an advisor to inmates of all faiths, but that he voiced opposition to advising any inmate who would attempt to perjure himself at a hearing. Plaintiff offered into evidence a series of letters between himself and Mrs. T. Stewart, the hearings officer, regarding his desire to be listed as an inmate advisor, at first limited only to advising Muslims, Mrs. Stewart's denial of his request on the grounds that inmates are not allowed to choose an advisor, and plaintiff's renewed request to be added to the list stating he would represent anyone so long as he was not required to countenance lying. (Pltf.Ex. 37, 38, 39, 40).

*Testimony of Ronald Angelone*

Ronald Angelone, Director of the VDOC as of May 1, 1994 and defendant in this case, testified regarding the provision of religious services in the VDOC. He stated that there is a letter of understanding between the VDOC and Chaplain Service of the Churches of Virginia, Inc. ("Chaplain Service"). The original understanding was superseded by a more recent one which was reduced to writing within the last six months before the plenary hearing. Angelone affirmed that apart from the letter of understanding, the state of Virginia does not provide any religious services to inmates. He testified that his responsibility was merely to set policies regarding access to the prison by persons from the outside, and that he does not set religious policy.

Plaintiff introduced into evidence Angelone's Answers to Plaintiff's July 26, 1995 Interrogatories. In the answers, Angelone described the relationship between the prison chaplain and the state in providing religious services to inmates. The state provides no religious services. Instead, the Chaplain Service proscribed the chaplains' duties and responsibilities in each prison, which included scheduling and coordinating religious activities within appropriate institutional channels and guidelines, advocating the equitable allotment of time and space for religious programming by all recognized denominations, faiths, and sects without preference for any activity of one religion or organization over another, and meeting with and offering spiritual guidance to inmates of all faiths. In addition, the chaplains were also to direct the Protestant Christian programs at each institution.

Angelone's interrogatory answers also describe the support provided by the VDOC. It consisted of providing appropriate space, supplies and other support services for the chaplains in locations within each prison designated for religious programs and chaplaincy use. The VDOC also provides security screening and training as well as training regarding applicable VDOC policies. The VDOC also allows each institutional chaplain to be involved in the planning of space to be used for religious programs, and gives each chaplain an opportunity for input regarding development of policies and procedures concerning religious activities and programs, just like other official treatment program staff at the institutions.

This evidence was consistent with the terms of the Memorandum of Understanding between the VDOC and the Chaplain Service which was dated July 1, 1996. (Pltf.Ex. 2). Angelone further testified that, barring a security emergency, the terms of that understanding would be followed by each institution in the system. He noted that monitoring the execution of the terms of the understanding is handled at the institutional level, and inmate complaints about the programs are handled through the inmate grievance procedure. Appeals are perfected through each facility's volunteer

coordinator (a VDOC staff positions), who answers directly to the VDOC's Deputy Director of Programs.

Angelone emphasized that the memorandum of understanding between the VDOC and the Chaplain Service was entered into with the understanding that its terms would be carried out fairly and impartially. There never has been a VDOC policy, either written or implied, that would foster any type of harassment or discrimination against Muslims because of their faith nor has the VDOC ever implemented a policy that required or permitted the prison administration to keep records of Muslim inmates differently from records kept on inmates of other faiths.

It is clear from Angelone's testimony and his interrogatory evidence that the VDOC does not disburse any state funds to institutional chaplains or the Chaplain Service. The cost of office space and miscellaneous support and supplies such as the use of a copier, telephone, paper, and other office supplies is part of the total institutional operating budget and these amounts are not separated according to user. The VDOC also provides inmate clerks who essentially perform executive secretarial duties. Their pay ranges from $.27 to $.35 per hour.

Angelone's interrogatory answers also described the workings of the so-called "Chaplain's Fund." The "Chaplain's Discretionary Fund" is a private bank account separate from all other institutional accounts, and each institutional chaplain has the discretion over whether an account is to be opened. In general, the monies in each Chaplain's Discretionary Fund are used for mercy needs of the entire inmate population. In some instances, sub-accounts are established for specific use by different religious groups, and these sub-accounts can only be used by and for the members of the specific religious groups for which they are established. They represent funds contributed by a specific inmate religious group or by outside religious organizations for the purpose of purchasing religious materials for that specific sect or denomination. Requests for disbursement of the funds from a sub-account must be made in writing to the institutional chaplain by a designated representative of that religious group. Disbursements from the sub-accounts may be used for religious books and materials which are designated for use by the entire religious group. The chaplains are required to consult with institutional administration prior to making any purchases so that the items purchased are acceptable in the institution, and it is the responsibility of the chaplain to ensure that donated funds are used for the designated purpose.

Some institutions also have a "Chaplain's Fund." This fund is established by the administration of the institution to use for various humanitarian services. These accounts are managed by the paid staff of the applicable institutions, with or without the involvement of the institutional chaplain.

Angelone also testified that he personally never received or read any communications from plaintiff regarding the provision of religious services either at Staunton or Dillwyn. He stated that if plaintiff did send any communications to his office, it is probable that a member of his staff would have read it.

*Testimony of Edward William Murray*

Edward William Murray, currently Chief of Operations for the Department of Corrections of Juvenile Justice, was the Director of the VDOC from 1986 through 1994. He testified that the original purpose of the understanding between the VDOC and the Chaplain Service was to provide ongoing religious services to the inmates of the VDOC by providing religious volunteers access to the prisoner population. Over the years, however, the Chaplain Service assumed the role of coordinating all religious activities. Murray stated that, as the Director of the VDOC, he did not have a day-to-day role in overseeing the religious activities or the work of the chaplains. The Director essentially assures that policies of the VDOC, as a whole, are enforced. Wardens and Deputy Wardens of each institution are charged with the responsibility for the daily oversight of all services to the particular institutions. Moreover, the Board of Corrections, and not the Director, has the ultimate responsibility for ensuring the prisoners have access to religious services.

Murray stated that the relationship between the VDOC and the Chaplain Service is defined by both the current and previous understandings. The Chaplain Service simply provides volunteers, coordinates religious activities, and conducts certain religious services. The Chaplain Service's responsibility to arrange for religious volunteers was contingent, of course, on the availability of such volunteers. Murray stated that the chaplains did not have a duty to seek out volunteers, and he noted that some institutional chaplains were more proactive than others. Murray corroborated Angelone's evidence that the VDOC's role in all of this was to provide security screening of volunteers, as well as to provide space and facilities for services. Each institution also provides inmate clerical support, both paid and volunteer, and bears the expense for space, facilities, and office supplies for each chaplain.

Murray also explained that the institutional chaplain has the primary responsibility for coordinating the use of religious volunteers at each facility, but that there are occasions when this also is done by the institution's volunteer coordinator, a VDOC employee. The chaplain sees that any potential religious volunteer is screened by security, which screening includes a criminal record check. No volunteer, whether religious or otherwise, can be admitted unless he is approved by the institution's security personnel.

*Testimony of Larry Huffman*

Larry Huffman, Regional Director of the VDOC, testified that each institutional warden is in charge of coordinating the chaplaincy program for his facility. The warden has the option of treating the chaplain as if he were a staff member, even a departmental head, and at some facilities, the chaplain attends monthly departmental staff meetings. Nevertheless, chaplains are not state employees, and, other than on issues of security, are not under the control of the institution.

Huffman noted that I.O.P. 850 does not require but rather gives chaplains the authority to seek out volunteers.[4] The fact that no Muslim volunteers have come into Dillwyn since its opening in 1993 was not surprising to Huffman because the prison is located in a rural area. When presented with a copy of the original written understanding between the VDOC and the Chaplain Service dated August 14, 1979, Huffman acknowledged that its language indicated that the chaplain *shall* solicit the services of volunteers to assist inmates of different faiths. (Pltf.Ex. 4). The word "shall," however, was not interpreted to require the mustering of "volunteers" for each faith or denomination. Rather, it was interpreted to mean that the Chaplain and not the VDOC was in charge of securing volunteer assistance.

Huffman emphasized that the chaplain should treat all faith groups fairly and that there was no VDOC policy advocating or approving discrimination against any one faith group, or requiring that lists be kept of prisoners with Korans.

*Testimony of Charles E. Thompson*

Defendant Charles E. Thompson, the Warden at Staunton since October 1994, described the role of the chaplain at his facility. He stated that the chaplain coordinated access of religious volunteers to inmates, including those inmates not of the chaplain's faith.

He stated that the chaplain's clerk was a paid inmate position at Staunton, and that the inmate's job was to provide clerical services as instructed by the chaplain. Thompson also pointed out that the institution had a policy requiring equal treatment of prisoners of all faiths.

*Testimony of Rashaad Muhammed Abdur-Rahman*

Rashaad Muhammed Abdur-Rahman, a former inmate at Staunton who knew plaintiff as a clerk in the law library and as a member and later secretary of the Muslim inmate community at the institution, testified

---

**4.** Plaintiff introduced into evidence I.O.P. 850, Dillwyn's internal procedures regarding inmate religious activities. (Pltf.Ex. 3). It was signed by both Huffman as Regional Director and D.T. Mahon, Warden of Dillwyn, in March and February 1996, respectively. I.O.P. 850-7.2(1) indicates that the chaplain will function as a department head and will make administrative reports as required to the warden.

about his knowledge of Chaplain Roepke's involvement in assisting the Muslim community. He had no knowledge of Chaplain Roepke helping the Muslim community by giving them supplies, securing extra time in the chapel, or writing recommendation letters for them. Chaplain Roepke did attend one Muslim service and helped with and spoke at a program during Black History Month. During that program Chaplain Roepke admitted he was, in Abdur–Rahman's words, a "closet racist."

Abdur-Rahman also noted that there were problems getting Muslim volunteers into Staunton. One volunteer named Michael had been admitted to lead services, help inmates with family issues, and counsel inmates, but access later was terminated because his application failed accurately to reveal his entire criminal record. Abdur–Rahman also stated he had made a request to be a volunteer to the Muslims at Dillwyn, but that he was denied because of the serious nature of and circumstances surrounding his crimes. To his knowledge, there was never a Muslim inmate listed on the Staunton inmate advisor list. He also noted that plaintiff complained to him about not having Muslim services announced over the public address system, and he was aware that plaintiff personally requested announcements for the Sunday 10:00 a.m. services.

*Testimony of Abdul Jabal Ameen*

James Abdul Jabal Ameen, a prisoner at Staunton until July 8, 1994, testified that he was a former imam of the Muslim community at Staunton and knew plaintiff as a member of that group. Ameen testified that he met with Chaplain Roepke several times and requested an outside volunteer to assist with Muslim activities, as he knew that Roepke represented only the Christians. Ameen testified that Roepke explained that he could not adequately represent the Muslims because his faith and the Muslim faith were so different. Ameen admitted to the court that a Christian pastor would have difficulty counseling or advising inmates about matters of the Muslim faith, and he could not recall the chaplain's response to his request for a Muslim representative.

Ameen also stated that Roepke never wrote a recommendation letter for a Muslim inmate. Ameen also revealed he made a request to Roepke for extra time in the chapel but was told to make the request directly to Major Jack, the Chief of Security.

Ameen did not know whether Roepke was ever asked to allow them to display literature in his office. He noted that the Muslims would display their flag and a sign on Friday, but, by the next day, those items would be removed from display and placed in a closet or cabinet. According to Ameen, approximately 35 to 40 inmates, and sometimes as many as 50 inmates, out of a total inmate population of 600 to 700, attended the Muslim worship services at Staunton.

He also related that he had a confrontation with a Christian inmate named Wayne Salzer, who persistently tried to evangelize among the Muslim inmate population. Ameen participated in a meeting held with Salzer and Chaplain Roepke and told Salzer to respect the Muslims' religious beliefs. Ameen stated that during the meeting, Roepke confessed he sympathized with Salzer's desire to convert the Muslims because he, Roepke, believe the Muslims worshiped the devil.

*Testimony of Jerome A. Battle, a.k.a. Mustafa Shareef*

Jerome A. Battle, a former inmate at Staunton, knew plaintiff as a member of the Muslim community there. He testified that he often had personal contact with Chaplain Roepke, as he needed the chaplain's permission to visit the Muslim library located in the chaplain's office. Battle could not recall ever being denied access to the office. He complained, however, that he often would leave Muslim literature out on display on the days he used the chaplain's office, but that the next day it would be put away. He further testified that he never touched the Christian materials that were left out in the office.

Battle also asserted that Roepke never helped any Muslim prisoners, nor did the chaplain help him secure extra time in the chapel when he requested it. Battle admitted to having no copies of any written requests given to the chaplain for extra chapel time. He remembered, however, swapping

time slots with the Christian group to attain more time for the Muslims, and noted that May Donna Campbell, the staff coordinator for volunteers, did not put forth as much effort to secure volunteers for Muslims as she did for other groups.

Battle also recalled plaintiff relating that an order was given to plaintiff to compile a list of inmates who possessed a Koran. He remembered that the need for the list somehow was related to inmate property issues at the facility, and that the Muslim community purchased Korans to resell to Muslim inmates. He testified that members of the Muslim community submitted names to plaintiff, and that plaintiff did compile a list, but he did not know what happened to the list after plaintiff compiled it. Battle was not aware that Christians were ever told to compile a list of inmates with Bibles.

Battle also testified that plaintiff applied to be an inmate advisor but that the application was denied.

*Testimony of Janice Dow*

Janice Dow, Community Resource Manager of the VDOC, described her duties as identifying community resources, primarily volunteer services, that meet the various needs of inmates. She helps coordinate volunteers in probationary facilities, religious programming, educational tutoring, treatment programs, and education and life skills. She explained that volunteers are recruited on an individual basis and most often at the institutional level. Prospective volunteers must complete a volunteer application form, be fingerprinted, and undergo a background investigation. Ms. Dow then sends all the information to the warden of the institution where the volunteer services would be preformed. She keeps a log of all volunteers.

Dow also explained that the Chaplain Service works hand-in-hand with the warden of each institution under the memorandum of understanding. No similar document has been developed for other volunteer groups, but one is in the draft stage between the VDOC and the Virginia Department of Correctional Education. Under the arrangement between the VDOC and the Chaplain Service, the Chaplain Service provides religious services to inmates who are of the same faith as the chaplain assigned to the institution. The Chaplain Service also endeavors to identify and provide volunteers for inmates of other faiths. She noted that the chaplains at some institutions are more involved in seeking out volunteers than those at other institutions. If a particular chaplain at an institution fails to organize the provision of certain services, the community volunteers arrange them.

Dow explained that the VDOC desires volunteers because it lacks the resources necessary to provide the services that can be provided when volunteers participate. If there are no volunteers, then nonessential but desirable services simply cannot be provided to the inmates. This witness stated that, to her knowledge, the VDOC never has paid anyone to provide religious services to inmates.

She noted that volunteers are free to discontinue their activities at any time, and that she has no responsibility over how the chaplains at each institution carry out their responsibilities as outlined in the memorandum of understanding. She has no direct supervision over the chaplains, and they are not employees of the VDOC. Although each warden may have offered individual accommodations for the chaplain at a particular institution, she simply acts as a liaison between the VDOC and the Chaplain Service. She also pointed out that the security at an institution always takes precedence over all programs, including religious activities.

*Stipulated Testimony of Leon Thomas, a.k.a. Wali Hakim Zakee*

The parties stipulated that Leon Thomas, a.k.a. Wali Hakim Zakee, had he been called, would have testified that he requested to have plaintiff as his inmate advisor at a disciplinary hearing, but that the request was denied. Mr. Zakee's request form, including a response to the request, was admitted into evidence. (Pltf.Ex. 42). According to the written response to Mr. Zakee's request, inmate advisors are appointed according to D.O.P. 861, which does not permit an inmate to choose a specific inmate as an advisor.

*Testimony of Marvin A. Williams*

Marvin A. Williams, currently an inmate of Haynesville Correctional Center, was previously incarcerated at Dillwyn where he met plaintiff. Both practiced the Islamic faith, and Williams was the imam of the Muslim group at Dillwyn. He and plaintiff met with Chaplain Rackley at Dillwyn in January 1996. Chaplain Rackley explained to them that he learned about the Muslim faith from Southern Baptists. Plaintiff questioned the chaplain about his knowledge of Islam and concluded that the chaplain's knowledge was lacking. Williams testified that plaintiff asked the chaplain to attend Muslim services and to help him obtain Muslim volunteers from outside the prison. Chaplain Rackley's response was that he could not help them, and, in fact, Rackley never did help them nor did he attend a Muslim service.

*Testimony of Steven Hollar*

Steven Hollar, currently the Assistant Warden of Operations at Staunton, was the Assistant Warden of Programs at Staunton when he met plaintiff. As Assistant Warden of Programs, one of his duties was to oversee the provision of religious services. He testified that during his tenure approximately 130 religious volunteers provided services to inmates. Out of that number, two volunteers assisted the Muslims.

Hollar played a role in screening all volunteers, and they were required to complete an application, undergo fingerprinting, and were subjected to background investigations. All applications, whether for religious or secular services, were evaluated the same way. Any criminal background was noted, and the warden had the final say as to whether the volunteer would be given permission to enter the facility. Customarily, persons who had a felony record were denied access. Exceptions were, and currently are made based on the nature of the felony, the length of time since the person's release from prison, the nature of the services to be provided, and information provided by the volunteer's parole officer.[5]

Hollar testified that the institutional chaplain at Staunton had his office in the facility's Treatment Building which was outside the housing compound. All movement into and out of that building was controlled by the pass system. The Muslims used the chaplain's office for services on Fridays, and at various other times; Hollar was not aware that any Christian groups used the office for services.

According to Hollar, the institutional chaplain at Staunton was provided office supplies such as paper, typewriter ribbon, staples, and envelopes, and he had an inmate clerk. There were no guidelines regarding the use of these office supplies for religious activities, and there was very little oversight or interaction between the chaplain and the Staunton security staff. Hollar did not proscribe the number of hours that any volunteer, including the chaplain, would work. Other than security measures, the only oversight the institution had over religious services was in coordinating times and facilities for religious activities.

All religious materials such as Bibles, Korans, and Torahs were provided to inmates by volunteers, not the state or the VDOC. Aside from office supplies to the Chaplain's office, the institution did not provide funds for any religious organization. While the supplies were not to be distributed directly to inmates, Hollar was aware that photocopies of material were made for different groups and organizations. Mr. Hollar himself had photocopied material for the Muslim group on various occasions.

Hollar stated that he was usually in the facility when the Muslims held Friday Jumu'ah services, and that a maximum of fifteen inmates regularly attended those services. He noted that about eleven years ago the group's numbers were as high as twenty-five, but that they had dropped over the last four years to about fifteen.

Hollar stated that he did not know whether Chaplain Roepke ever sought out volunteers for the Muslims. He also noted that the inmate Christian Fellowship paid for the

---

5. It was clear to the court that where a felon seeks admission as a volunteer, many factors are considered, and the final decision essentially rests in the discretion of the warden. There is no evidence here that discretion was exercised in any discriminatory way.

plexiglass and wood on its bulletin board with money from its own account.

Hollar also explained that the chapel at Staunton was not usually open during week-days. Occasionally, the chapel would be opened on evenings during the week for special programs, but it was not available to the Muslim group for Friday Jumu'ah services because personnel assignments would have required that another recreational activity be closed in order to provide the proper security for the chapel. He noted that the Muslim group was the only religious group that was allowed to meet in the Treatment Building. Hollar was not informed by plaintiff or anyone from his Muslim group of any formal requirement that the Jumu'ah service be held in a chapel.

Addressing plaintiff's claim that he was asked to make a list of inmates owning Korans, Hollar explained that the Muslims requested to spend some of the group's funds on Korans for new members. Institutional policy required that all personal property, including religious books, be listed, and plaintiff simply was asked to compile the list. The purpose for maintaining an inmate property list is to control the quantity of property kept by each inmate in his cell and to protect against claims of loss. Hollar offered his belief that the list was compiled as instructed, but he acknowledged that the list could not be found, and, thus, may not have been compiled. He admitted that on one occasion the Gideons visited Staunton and handed out Bibles to inmates, that their activity was unexpected, and that no list was made of the inmates who received Bibles. However, the Gideons later were informed that they were not to pass out Bibles again without prior approval.

Hollar also explained that the Chaplain's Discretionary Fund consisted of monies raised by the inmates in the picture project for use in purchasing flowers and similar items. The fund was controlled by the assistant warden of programs, not the chaplain, because it belonged to the inmates. Regulations require the VDOC to oversee distribution of all funds belonging to inmates.

*Testimony of James Roepke*

James Roepke testified that he was employed by Chaplain Service of the Churches of Virginia, Inc., from January 1987 through September 1995 to serve as the chaplain at Staunton. His office at Staunton was provided by the VDOC, and during the last few years of his tenure, inmate clerks provided him assistance. The office, measuring approximately ten by twenty feet, was furnished with desks, tables that served as desks for the inmate clerks, and bookshelves. Adjacent to the office was a conference room of approximately the same size. The office was a place where the chaplain could counsel inmates, and it also served as a storage place for books and tapes that were donated by outside organizations. Although most of the organizations that made contributions were Christian, not all of the reading materials kept in the office were Christian.

The chaplain worked three days per week, four to five hours per day, averaging twelve to fifteen hours per week. When he was not in the office, it was used by other inmates and minister volunteers. The Muslims used the office prior to each Friday's Jumu'ah services, storing there a table, a small podium, an emblem, and a locked cabinet upon which hung an Arabic poster. If a Muslim desired access to the office, like any other person wishing to visit the office, he would have to obtain a pass because the office was in the Treatment Building. Chaplain Roepke was not aware of any occasion when a Muslim inmate, including plaintiff, was denied a pass when seeking to visit the office or confer with the chaplain.

Chaplain Roepke testified that he had met with plaintiff and with inmate Ameen to resolve a conflict between certain Muslim inmates and a Christian inmate named Salzer. Tension had built between Salzer and Muslim inmates because of Salzer's aggressive and coercive evangelical tactics. Roepke also met with plaintiff concerning his desire to have a Catholic priest officiate at his wedding. Plaintiff's fiancee was Catholic. Roepke telephoned a local Catholic priest and apprised the priest of plaintiff's desire to speak with him. Roepke also suggested that plaintiff attend a Catholic service in the pris-

on in order to meet with the priest and offered to perform the wedding for plaintiff if the Catholic priest would not do so. Roepke met with plaintiff on one other occasion in the Spring of 1994 regarding his wedding plans, during which he and plaintiff had a conversation about matters of faith. Roepke testified that they joined in prayer during this meeting.

Roepke explained that he received office supplies from the VDOC, including stationary, paper, pens, filing cabinets, desks, and a phone. Roepke stated that there were no guidelines regarding allowing inmates to use copy paper, and believed he had the authority to make photocopies for inmates. While Roepke made photocopies for some inmates, he never made any for plaintiff because plaintiff never asked for any. If plaintiff had made a request for a reasonable number of copies, Roepke would have honored the request, an accommodation he made to all religious groups. Roepke was not restricted by a quota or guideline in deciding when to allow copying, but he always considered whether the copies were needed for use by a religious group or organization and not just by a single inmate. Roepke further testified that he made photocopies for the Muslims whenever Randolph Robinson, a Muslim who worked as clerk in his office, requested copies. The papers copied contained the Muslim logo and often Arabic lettering on them, and to Roepke's recollection, he never refused Robinson's request for photocopies.

Roepke also explained that he played a role in the selection of clerks for his office. Roepke would interview the inmates who were interested, and he then would submit the name of the inmate he chose to Steve Hollar who, in turn, would submit the name to the ICC for approval. Plaintiff never applied for the position of chaplain's clerk.

The chaplain controlled the day-to-day activities of his inmate clerks. He did not restrict their work to only Protestant activities, as their work could and did pertain to other faiths. One of the tasks of the clerks was to maintain the library which included literature for a number of faiths and denominations. The clerks also generally oversaw

office use and served as the inmates' contact when the chaplain was not in the office.

Roepke also noted that the VDOC had no control over what occurred in his office. The institution's security personnel did have control over who entered and left the compound and the Treatment Building, and the administration controlled matters of assigning time and space for meetings. The Chaplain's Discretionary Fund was overseen by the Assistant Warden and not by Roepke.

Bulletin boards and the material posted on them were maintained and improved directly by the inmate groups that used them. During one of his meetings with the Christian Fellowship, Roepke observed a discussion of how the group planned to upgrade its bulletin board. Once a group decided to upgrade a bulletin board, the upgrade plan was submitted to the security department for approval. Roepke was not aware of any requests made by the plaintiff to upgrade the Muslim bulletin board.

Moreover, Roepke stated that plaintiff did not request the privileges that he claims Roepke denied him. According to Roepke, plaintiff never requested to use the typewriter in the chaplain's office, never sought photocopies, nor did he request to display Muslim literature in the chaplain's office. Roepke also denied that plaintiff ever requested that Roepke write a letter of recommendation. Roepke seldom wrote recommendation letters for inmates in the first place. He declined to do so most often because he did not know the inmate well enough to write a letter on his behalf. Roepke never declined to write a letter based on the religious affiliation of the inmate.

Roepke also denied that plaintiff ever asked him to arrange extra time in the chapel. Roepke noted that the Christian Fellowship and the Muslim group arranged to swap time in the chapel. In those situations, Roepke would notify security that the swap had occurred.

Roepke further testified that he had no view that Muslims particularly were potential converts. Any statement that he may have made to that effect merely was a repetition

of what Salzer believed in order to mediate between him and his Muslim opponents.

Roepke offered that he made efforts to contact potential Muslim volunteers. He remembers contacting Michael Al–Khahar at the request of the Muslim community. Roepke offered to send Al–Khahar an application form. Roepke believed his role was to coordinate, not initiate. He admitted that he was not proactive in seeking volunteers.

Roepke was hired and paid by the Chaplain Service of the Churches of Virginia, Inc., to serve as the Protestant chaplain both at Staunton and also at Augusta Correctional Center ("ACC"). Roepke stated that he was not an authority on Islam and was not the chaplain for the Muslims. He also noted that he was not aware that plaintiff ever made an official request for the appointment of a person to serve in the role of a Muslim chaplain, as such.

Although he was unable to attend every religious activity at Staunton, Roepke made an effort to attend every kind of religious service that was held in the prison at least once. He attended one Muslim Jumu'ah service at the invitation of Rahman.

### Testimony of Joel Rackley

Joel Rackley is currently serving as the chaplain at Buckingham and Dillwyn Correctional Centers. He does not receive any compensation for his services from the VDOC, and the VDOC does not control the day-to-day operations of his office. During his one year at Dillwyn, there have been no Muslim volunteers in the prison. Plaintiff has asked Rackley once or twice to bring Muslim volunteers into the prison, but Rackley stated that he has no authority to bring any volunteers into Dillwyn. All volunteers must be screened through the volunteer coordinator, and he considers the active solicitation of volunteers outside his role as chaplain.

Rackley testified that he has arranged for Korans to be given to prisoners who are confined in the "hole" or special housing. Moreover, he has invited plaintiff to meet with him to review some of the Islamic literature he has received. Plaintiff has refused to attend. (Def. Ex. 1 & 2).

### Testimony of Paul Waller, Jr.

Paul Waller, Jr. is currently an inmate housed at Dillwyn. He knows plaintiff from his interaction with him at Dillwyn. Waller is a member of the Holy Tabernacle Ministry, an outgrowth of the al-Islamic community. Waller testified that both he and plaintiff have personally requested that Rackley help them to recruit Muslim volunteers to come to Dillwyn, but no help has been forthcoming.

### Testimony of Ricky Wayne Boblett

Ricky Wayne Boblett, an inmate currently housed at Dillwyn, knows plaintiff because they lived in the same dorm for a few months. Boblett practices a Native American religion, but he has attended Muslim activities. He testified that he knows that plaintiff has tried unsuccessfully to obtain outside volunteers to assist during Ramadan.

### Defendant's Evidence

### Testimony of Theresa T. Stewart

Theresa T. Stewart, an inmate hearings officer, testified regarding the use of inmate advisors. She explained that a prisoner does not have a right to choose who will be his inmate advisor. The advisors are appointed from a preapproved list on a rotating basis under D.O.P. 861. (Def.Ex. 3).

She testified that plaintiff had requested to be placed on the list of inmate advisors, but he indicated that he only wanted to represent selected inmates. To allow plaintiff to choose the inmates he would represent ran counter to the regulations set forth in D.O.P. 861. Thus, his request to be an inmate advisor was denied.

### Testimony of May Donna Campbell

May Donna Campbell has been the Volunteer Services Director at Staunton since August 1989. She testified that the only reason for a list of inmates with Korans would be for property inventory. According to Campbell, such a list was never compiled, but she recalled requesting a list of inmates who received Kufis, or religious caps, purchased through the Muslim organization. (Def.Ex. 4). The Kufis were added to each inmate's property list. Failure to list any property on

an inmate's property list invariably led to the confiscation of the omitted item.

Campbell also identified Defendants'· Exhibit 5 as schedules of activities at Staunton. Among the activities listed are a variety of Muslim services and Arabic classes. (Def.Ex. 5). Campbell further testified that at the time plaintiff was incarcerated at Staunton, there were approximately 750 inmates housed there, but that there had been no significant increase in staffing. Scheduling decisions always accounted for the availability of security staff to oversee the activity.

### Testimony of Daniel Mahon

Daniel Mahon, Warden at Dillwyn, testified plaintiff was housed in special housing at Dillwyn from May 8 through 9, 1995, from May 25 through 26, 1995, and from June 18 through 19, 1995. (Def.Ex. 6). He explained that policy allowed inmates access to religious books while in special housing, and that there were Bibles and Korans available for inmates' use in the unit. Recently, a security policy was instituted forbidding the use of hard-cover books in the special housing unit for obvious reasons of their use to hide contraband.

Mahon acknowledged that he denied a request by Rashaad Muhammed Abdur–Rahman to visit plaintiff at Dillwyn because of the nature of Abdur–Rahman's crimes and the existence of enemies in the prison system. (Def.Ex. 7).

Mahon also testified that currently there is someone going through the security investigation to be approved to volunteer with the prison Muslim community. He noted that at some point that person's name must be approved by him.

### APPLICABLE LAW

■ To succeed on a claim under 42 U.S.C. § 1983, plaintiff must show both a violation of a right secured by the Constitution and laws of the United States and that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

### State Action Requirement

■ To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State … or by a person for whom the State is responsible, … and the party charged with the deprivation must be a person who may fairly be said to be a state actor." *West,* 487 U.S. at 49 (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)).

■ Three principles helpful in determining whether a private party charged with a deprivation can be described as a state actor are: "(1) the extent to which the actor relies on governmental assistance and benefits; (2) whether the actor is performing a traditional governmental function; and (3) whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Georgia v. McCollum,* 505 U.S. 42, 51, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (quoting *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 621–22, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991)).

### Equal Protection

■ To succeed on an equal protection claim, a plaintiff must show that he was treated differently from others who were similarly situated and that such unequal treatment was the result of intentional or purposeful discrimination. *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944); *Sylvia Development Corp. v. Calvert Cty., Md.,* 48 F.3d 810, 819 (4th Cir. 1995); *Shaheed v. Winston,* 885 F.Supp. 861, 869 (E.D.Va.1995). Once a plaintiff makes this threshold showing, the court then must determine whether the disparity is justified. Where a disparity in treatment impinges upon a fundamental right, the court's inquiry ordinarily sharpens to determine whether the classification or disparity is narrowly tailored to serve a compelling government interest. *O'Bar v. Pinion,* 953 F.2d 74, 81–82 (4th Cir.1991) (citing *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). However, in the context of prison administration, the standard of review involves a four part inquiry. *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108

L.Ed.2d 178 (1990); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Shaheed,* 885 F.Supp. at 868–69.

First, the court must examine whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. *Turner,* 482 U.S. at 89. The second inquiry is whether there are alternative means of exercising the right that remain open to inmates. *Id.* at 90. The third consideration is the impact that accommodating the inmate's right will have on guards and other inmates, and on the allocation of prison resources generally. *Id.* Fourth, the court must assess whether there are readily available alternatives to the challenged policy or regulation that have a lesser impact upon the exercise of the impacted fundamental right. *Id.*[6]

*Free Exercise of Religion*

Under *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), a prisoner's desire to practice his religion may only be restricted upon a showing that the restriction is reasonably related to a legitimate penological interest. 482 U.S. at 349. On November 16, 1993, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb—2000bb–4, became law. RFRA modifies the standard by which government infringement on the right to free exercise of religion is judged. The Act's stated purpose is "to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and to guarantee its application in all cases where free exercise of religion is substantially burdened...." 42 U.S.C. § 2000bb(b)(1). Under RFRA, the government may not substantially burden a person's exercise of religion, even if the burden results from a rule that is of general applicability, unless the govern-

ment demonstrates that such burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering the governmental interest. 42 U.S.C. § 2000bb–1(a)–(b).[7]

Plaintiff filed his complaint after the enactment of RFRA, but he did not seek relief under the Act. Some courts believe that RFRA's compelling interest standard should supplant the *O'Lone* standard for all cases arising after its enactment irrespective of whether the Act is specifically invoked in the complaint. *See, e.g., Werner v. McCotter,* 49 F.3d 1476 (10th Cir.1995), *cert. denied* 515 U.S. 1183, 116 S.Ct. 31, 132 L.Ed.2d 913 (1995) (holding that RFRA encompasses claims of prisoners alleging interference with the free exercise of religion and applies retroactively); *Besh v. Bradley,* No. 94–5124, 1995 WL 68774, 47 F.3d 1167 (6th Cir. 1995) (noting that RFRA does not create an exception as to prisoners, that the Senate Judiciary Committee report indicates the Act creates a single test that applies to prisoners and that the Act was intended to restore the protection afforded to prisoners' exercise of religion before *O'Lone*).

The court in *Shaheed* took the opposite view, however. There, Muslim inmates at the Richmond City Jail and their Imam brought suit under 42 U.S.C. § 1983 alleging violations of their First Amendment right to free exercise of religion, their Fourteenth Amendment right to equal protection of the laws, and their right to be free from governmental discrimination under article 1, section 11 of the Constitution of Virginia. 885 F.Supp. at 863. The allegations in *Shaheed* were similar to those in the case at bar, and they included claims that plaintiffs were denied access to Muslim ministers and that passes were necessary to attend religious services. The court for the Eastern District of Virginia recognized that RFRA requires the application of the "compelling interest"

**6.** The Supreme Court noted in *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), that not every religious sect or group within a prison, however few in number, must have identical facilities or personnel. *Id.* at 322 n. 2.

**7.** The initial inquiry in analyzing a claim under RFRA is whether a substantial burden has been imposed on the exercise of sincerely-held reli-

gious beliefs. Only then does the government have the burden of coming forward with proof of a compelling interest. *Goodall v. Stafford County School Bd.,* 60 F.3d 168, 171 (4th Cir.1995). It is not a substantial burden on an individual's free exercise of religion where a law or policy merely operates to make the practice of one's religious beliefs more expensive. *Id.*

standard, but it assessed the alleged conduct under the reasonableness standard established by *O'Lone* because the plaintiffs there had failed to allege RFRA violations. *Shaheed*, 885 F.Supp. at 866 n. 1. The court further nixed plaintiffs' eleventh hour attempts to amend their complaint to allege RFRA violations. Probably most important to a decision in this case, the *Shaheed* court also observed that plaintiffs would not have been entitled to recover under RFRA because the facts did not show that the challenged actions "substantially burdened" plaintiffs' free exercise of religion. *Id.*

Whether the court applies *O'Lone* or RFRA, it should not lose sight of the central objective of prison administration, namely, providing and insuring the safety and security of the institution. *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Accordingly the court must afford deference to the decisions of prison administrators concerning the accommodation of prisoners' rights within the context of institutional order and security. *Id.* While an inmate is absolutely entitled to his religious beliefs, not always is he entitled to exercise all the practices related to those beliefs free of restriction or oversight. *See Dettmer v. Landon*, 799 F.2d 929, 933–34 (4th Cir.1986).

*FINDINGS AND CONCLUSIONS*

*Roepke*

■ At the conclusion of plaintiff's evidence, Roepke moved for judgment as a matter of law on the ground that he was not a state actor and, thus, not subject to liability under 42 U.S.C. § 1983. The court announced its findings and conclusions from the bench, essentially determining that Roepke was not acting under color of state law as Chaplain at Staunton, and it reserved the right to supplement its findings and conclusion here.

The undisputed evidence is that Roepke was not an employee of the VDOC. Rather, he was employed by Chaplain Service of the Churches of Virginia, Inc., which was allowed to provide chaplaincy services to corrections institutions under a Memorandum of Understanding with the VDOC. The Chaplain Service had the right to hire, fire, and control the performance of chaplain duties, and the only extent to which the VDOC exercised control was over issues of security, matters over which the VDOC would always have control in a prison setting.

Moreover, under *Edmonson*, Roepke's reliance on governmental assistance and benefits was minimal. It is true that the VDOC provided space and facilities for chaplains as well as inmate secretarial support. However, other religious groups were allowed to utilize the same space and facilities, and the efforts of the inmate clerical assistant benefited any inmate who chose to make use of the chaplain's office or the collection of varied religious materials therein. The point here is that in a prison setting, space for the performance of *any* volunteer service would have to be provided by the state as those services could not be performed outside the prison fences.

In addition, and probably of utmost importance to this court, as chaplain, Roepke was not performing what those of the modern times would think of as a governmental function. On the contrary, the evidence in this case is clear and uncontradicted that the VDOC absolutely would not provide religious services to inmates and that such would not be available if organizations such as the Chaplain Service did not come forward with volunteers.[8] The only reason for the original and most recent memoranda of understanding between the VDOC and the Chaplain Service was to establish a central clearing house for the provision of volunteer religious activities to inmates housed in the VDOC. Those understandings did not convert the Chaplain Service or any of its employees to agents of the VDOC, nor did they convert volunteerism into governmental function.

Last, plaintiff produced no evidence upon which this court can find that his alleged injury was "aggravated in a unique way by the incidents of governmental authority." This is so because the court cannot find that

---

8. Of course, Roepke did not volunteer his work to the Chaplain Service, but the Chaplain Service provided services through Roepke to the VDOC free of charge as a coordinator or clearing house for volunteers.

Roepke caused any injury at all to this plaintiff irrespective of how his association with Staunton is viewed. Even if some injury can be attributed to his conduct, there is not one iota of evidence suggesting that incidents of governmental authority aggravated that injury.

While this court hesitates to enter the forum of policymaking, for that realm is better left to the reviewing courts, this is one of those cases in which policy cannot be ignored. If volunteers, like the Chaplain Service and its employees, are considered to be performing their volunteer tasks under color of state law for Section 1983 purposes, the plain and simple truth is that there will be no volunteerism in the prisons. That would abate a great number of rehabilitative programs now offered to inmates solely by volunteers.

The evidence clearly shows that the state would not directly provide the services Chaplain Roepke offered. It is in the best interest of both the prisoners who directly benefit from the religious services that volunteers such as Roepke provide and the volunteers themselves that they not be considered state actors. Furthermore, if the court held that Roepke was a state actor, the court would essentially be saying that the state is obligated to provide religious services to its prisoners. Such a ruling would be contrary to the Establishment Clause. Thus, it is

### RECOMMENDED

that the presiding District Judge enter an order granting defendant Roepke's motion for judgment as a matter of law on the grounds that he was not a state actor and thus not acting under the color or authority of state law as required for liability under 42 U.S.C. § 1983 and dismissing defendant Roepke from this action. *Accord John David Simpson, # 110023 v. William H. Dent, et al.,* No. 2:95cv770 (E.D.Va. Jan. 22, 1996) (attached).

*Claims Against Institutional Defendants*

Once Roepke is dismissed, the balance of plaintiff's claims are against the institutional personnel and relate to a disparity in the size and quality of the bulletin boards (Claim (1)(a)); a disparity in the availability of state-owned paper supplied through the Chaplain's office (Claim (1)(c)); use of the Chaplain's Fund only for Christian activities (Claim (1)(d)); use of an inmate clerk solely for Christian activities (Claim (1)(e)); the disparity in plaintiff's working conditions and those of the Chaplain's clerk (Claim (1)(h)); failure to announce Muslim activities on the loudspeaker (Claim (1)(k)); denial of access to a Koran while in protective custody at Dillwyn (Claim (1)(p)(ii) and (1)(p)(iii)); denial of access to a Muslim chaplain (Claim (2)(b)); being directed to compile and Staunton maintaining a list of Muslim inmates with Korans in order to harass such inmates (Claims (6)(a) and (6)(b)); being required to obtain a pass for religious services in the Treatment Building (Claim (6)(c)); refusal to recognize prayer beads and Islamic holy symbols at Staunton (Claim (8)(a)); and refusing to appoint plaintiff as a qualified "Sunni Islamic" advisor (Claim (11)(c)). There is no question that the remaining defendants are state actors as required by Section 1983. *See West,* 487 U.S. at 50. However, plaintiff has failed to prove by a preponderance of the evidence that his rights were denied by any of the remaining defendants.

All of plaintiff's remaining claims against the institutional defendants imply a violation of his right to equal protection of the laws because he has been treated differently than similarly situated inmates of different faiths. Claims (1)(p)(ii), (1)(p)(iii), (2)(b), and (6)(c) also state a claim for the violation of plaintiff's right to the free exercise of his Muslim faith. With respect to plaintiff's equal protection claims, the evidence fails to show that plaintiff was treated differently at all. Thus, plaintiff did not meet the threshold requirement in an equal protection claim. On the contrary, the greater weight of the evidence shows that prisoners of all faiths were subject to the same rules and regulations and given the same opportunities. Moreover, there is no evidence that any perceived difference in treatment of plaintiff was intentional or that it was because of plaintiff's faith. With respect to his claims that his right to the free exercise of his religion was violated, plaintiff failed to meet the threshold

requirement under both the *O'Lone* standard and under RFRA, as the preponderance of the evidence clearly showed that plaintiff was not unreasonably restricted or substantially burdened in the free exercise of his religion. The court, thus, turns to analyze each remaining claim.

■ With respect to claim (1)(a) that the state provided the Christian group a larger and more lavish bulletin board than the one provided to the Muslim group, the evidence shows that bulletin boards were maintained and improved by the inmate groups themselves. The Christian Fellowship used funds raised by its members to improve its bulletin board and, in addition to that fact, plaintiff never requested improvements to the Muslim bulletin board, nor did the Muslim group allocate funds for its improvement.

■ Plaintiff's claim that he was required to use his own funds to purchase paper for the Muslim group while the Christian group received paper from the state (Claim (1)(c)) also fails. The preponderance of the evidence is that there was a policy at Staunton prohibiting the provision of state-supplied paper and office supplies to inmates. Chaplain Roepke was unaware of the prohibition, however, and honored inmate requests for paper and photocopies, provided the requests were reasonable and would benefit the group as a whole. Chaplain Roepke did not base his decision on the religious affiliation of the requesting inmate. Moreover, the preponderance of the evidence fails to demonstrate that plaintiff ever requested state-supplied paper or photocopies from the Chaplain's office. Additionally, the uncontroverted evidence is that plaintiff held his position as secretary of the Muslim group voluntarily, and his donations to the group were made out of a sense of personal religious obligation.

■ Claim (1)(d) regarding the administration of the Chaplain's Fund, likewise, has no merit. The evidence clearly shows that plaintiff never requested disbursements from the general fund termed the "Chaplain's Discretionary Fund." In addition, the funds used solely for Christian activities were raised by the group using the funds, and all inmate groups had the opportunity to establish sub-accounts for their own use.[9]

Plaintiff's allegation that the inmate clerk assisting Chaplain Roepke worked only on Christian projects (Claim (1)(e)) was not substantiated by the evidence introduced at the hearing. The Chaplain's clerk was not limited to assisting only Christian activities. He worked on matters concerning various faiths. Moreover, it is conceded on the record that plaintiff never sought the position of Chaplain's Clerk.

■ Likewise, plaintiff's Claim (1)(h) that the Chaplain's clerk had an office, while plaintiff had to work on Muslim projects from his own cell also lacks merit. The evidence is clear that plaintiff performed volunteer work for the Muslim group. However, he did not seek nor did he desire the position of Chaplain's Clerk.[10] It is this court's view that plaintiff, simply as an inmate practicing the Muslim religion and volunteering his clerical skills for the religious group, has no right to an office. Consequentially, the VDOC's failure to provide him an office neither denies equal protection nor impinges on free exercise.

■ The evidence regarding announcements of Muslim activities over the public address system (Claim (1)(k)) shows that inmate announcements for any group were secondary to official prison security matters and that plaintiff's announcement requests were treated the same as any other inmate requests. No disparity was proved by a preponderance of the evidence, and, at most,

---

9. Plaintiff made some to-do over the fact that the funds were generated by sales of services to the general inmate population which included Muslims. That fact is not material to the outcome of this claim, for this court rejects the notion that simply because inmates of all faiths purchased the service, "their" money, in turn, was being disparately spent by the religious group that sold the services.

10. It appears that part of plaintiff's effort in this case is to elevate his position as secretary of the Muslim group to a chaplain's clerk position. The issue was not articulated in such a fashion as to permit the court to address it in this case, nor would the issue have merit on the evidence presented if it were articulated.

plaintiff could only establish random, isolated failures to announce that do not rise to the level of intentional misconduct.

■ Plaintiff's Claim (2)(b) that outside Muslim volunteers were refused permission to counsel Muslim inmates, including himself, also fails on the record developed before this court. The preponderance of the evidence is that all volunteers, religious and nonreligious, are subjected to the same security assessment. It is clear that the number of Muslims living in rural areas of Virginia near the Staunton facility and the willingness of Muslims to volunteer in the prisons is beyond the control of the defendants. Those factors directly affect the pool from which eligible volunteers may be selected. Most important, however, is the fact that the denials complained of in this case invariably were the product of the prospective volunteer's criminal record, a standard that applied equally to all who sought entry into the facility. Moreover, the lack of Muslim volunteers did not restrict or substantially burden plaintiff's ability to exercise his religion. Although plaintiff testified that he desired to learn more about the faith from outside volunteers, there was no evidence that his ability to practice his religion was in any way hindered for lack of contact with volunteers. On the contrary, it is undisputed that fellow inmates acted as imams, leading the group in prayer during regularly held services, and that plaintiff had access to a Koran and various literature on the Muslim faith.

■ Plaintiff's Claims (6)(a) and (6)(b) that he was denied equal protection because he was asked to provide a list of inmates who received Korans also lacks factual merit. It is a valid institutional policy to inventory all inmate property, including Bibles, Torahs, and Korans. Such inventories not only control the amount of property any one inmate may possess in his cell at one time, but the policy also serves to protect the institution from feigned claims of theft or loss. The great weight of the evidence shows that plaintiff was asked to provide a list of inmates who received Korans from the Muslim group as a simple device to update inmate property lists. He was chosen because of his position with the Muslim community, and he was asked to do no more than was done for every other inmate. Plaintiff's allegation that the list of Korans was requested to aid the prison administration in its efforts to harass and monitor Muslims is entirely unsupported by any evidence.

■ The undisputed evidence also shows that all inmates are required to obtain passes to go to the Treatment Building. Moreover, contrary to his allegation, plaintiff and his Muslim group were allowed to use the Staunton chapel on Sunday as were other religious groups. The Friday afternoon Muslim Jumu'ah service was not held in the chapel because security, a prerequisite for any inmate activity in the chapel, generally was not available at that time. The long and short of all this is that no activity—religious or secular—can occur within a prison setting without reasonable and appropriate security. Plaintiff failed to prove a disparity in treatment based on his religion, and thus he cannot prevail on his equal protection claim. Furthermore, plaintiff testified that he was never denied a pass to attend religious services in the Treatment Building. Other than minor inconvenience, he has shown no impingement on his ability to attend religious services held in the Treatment Building. Moreover, the court here finds that providing plaintiff's religious organization space for services in an area requiring the use of passes as a security measure does not violate plaintiff's rights especially where, as here, religious tenets require the performance of services on days or at times security is not otherwise available in a location where a pass system is not utilized. Therefore, plaintiff has failed to prove his Claim (6)(c) that his constitutional rights were violated because he was required to obtain a pass to enter the location where his religious services were conducted.[11]

■ Plaintiff's Claim (11)(c) also must fail on the evidence adduced at the hearing. It

---

11. It is interesting to note that plaintiff implied in his testimony on this issue that he was personally offended by having to obtain a pass even though he could not say that he ever was denied a pass to attend services.

is true that plaintiff apprised the institutional hearings officer that he wished to be placed on the inmate advisor list. However, the great weight of the evidence is that inmate advisors cannot pick and choose whom they represent, and, because plaintiff made himself only qualifiedly available, his application was denied. D.O.P. 861.

■ Plaintiff clarified Claim (8)(a) that defendants at Staunton refused to recognize Islamic prayer beads and other holy symbols as a claim regarding property lost during his transfer from Staunton to Dillwyn. As the Virginia Tort Claims Act provides an adequate state procedure and remedy, this claim is not proper under 42 U.S.C. § 1983. *See Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

Plaintiff's Claims (1)(p)(ii) and (1)(p)(iii) regarding denial of access to a Koran during some of the time he was in special housing at Dillwyn are also meritless. Chaplain Austin, whom plaintiff singles out in the claims, was dismissed from the case on July 9, 1996, and the evidence fails to show that any of the remaining defendants personally participated in or had knowledge of the alleged denial.

In the end, plaintiff has failed to prove by a preponderance of the evidence that his constitutional rights to the equal protection of the laws and to the free exercise of religion were violated. On the contrary, the evidence shows that plaintiff was treated the same as similarly situated inmates of different faiths, thus failing to prove a violation of his equal protection rights. Regardless of the standard applied, plaintiff also failed to prove that he was burdened in the free exercise of his religion. He failed to make the threshold showing under both *O'Lone*, that the free exercise of his Islamic faith was restricted, and under RFRA, that there was a substantial burden on the exercise of his beliefs. *Goodall*, 60 F.3d at 171. Moreover, the defendants have clearly demonstrated to the court that there were compelling security interests for every alleged limitation or claimed denial and that the least restrictive means were exerted to effectuate those interests. Accordingly, it is

RECOMMENDED

that the presiding District Judge enter an order granting judgment in favor of all defendants and against plaintiff and dismissing this action from the docket of this court.

The Clerk is directed to transmit immediately the record in this case to the Hon. James H. Michael, Jr., United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note objections, if any they may have, to this Report and Recommendation within (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court a waiver of such objection.

The Clerk of the Court is hereby directed to send a certified copy of this Report and Recommendation to plaintiff and to all counsel of record.

ATTACHMENT

John David Simpson, #110023, Plaintiff,

v.

William H. Dent, Jr., Loretta K. Kelly, Anza Standingdeer, Marcia Ornelas, Cecil N. Lewis, Donald Guillory, Ronald Angelone, and Larry Jarvis, Defendants.

Civil Action No. 2:95cv770.

Jan. 22, 1996.

### ORDER

*Motion for Protective Order*

On January 2, 1996, plaintiff, pursuant to Rule 33(a) of the Federal Rules of Civil Procedure, propounded a set of interrogatories to defendant Jarvis. The interrogatories total at least seventy-four (74) parts and subparts, exceeding the number permitted by Rule 33(a) and Local Rule 11.1 (A.1). In response, defendants filed a motion for a protective order on January 3, 1996. Defendants have raised the defense of good faith

qualified immunity. Until the threshold issue of good faith and qualified immunity has been resolved discovery should not be allowed. *Seigert v. Gilly,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). This issue is appropriately determined on a motion for summary judgment. *Id.* Accordingly, discovery is **STAYED** until further notice by this court.

### Demand for Jury Trial

Under Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff's motion for trial by jury was not timely filed. Defendants' answer was filed on December 20, 1995 and plaintiff's demand for trial by jury was filed on January 2, 1996. As a result, plaintiff is not entitled to a jury if his case proceeds to trial.

### Defendant William H. Dent

In order to state a claim under section 1983, plaintiff must allege that the conduct of which he complains was committed by a person acting under color of state law and that the conduct deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *see, e.g., West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). William H. Dent, Jr., named as a defendant in the complaint, is not an employee of the Commonwealth of Virginia and, therefore, is not "a person acting under color of state law" under 42 U.S.C. § 1983. William H. Dent, Jr., is herby DISMISSED as a defendant in this matter.

The clerk is directed to send a copy of this Order to plaintiff and to counsel for the defendants.

It is so **ORDERED.**

/s/ John A. MacKenzie
United States District Judge
Norfolk, Virginia