**Latif BLAGMAN, Plaintiff,**

v.

**James R. WHITE, et al., Defendants.**

**No. Civ.A. 99–537–AM.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 14, 2000.

Latif Blagman, Victoria, VA, plaintiff pro se.

Pamela Anne Sargent, Office of the Attorney General of Virginia, Richmond, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

A Virginia inmate brings this § 1983 action alleging that defendants, administrators of a "boot camp" program at Stafford Detention Center (SDC) abridged his First Amendment right to the free exercise of his Muslim religion and violated his rights under the Equal Protection Clause by treating Muslims less favorably than Christians. The inmate also asserts a claim that defendants attempted to discourage and intimidate Muslims from submitting grievances. For the reasons that follow, summary judgment must be entered for defendants.

### I.

Plaintiff, a Virginia inmate, is a practicing Muslim who was a participant in the SDC "boot camp" program from September 28, 1998 to February 12, 1999.[1] Named as defendants are James R. White, SDC Superintendent, and Ms. B. Evanchyk, SDC Assistant Superintendent.

SDC is a special residential detention facility for nonviolent male offenders. The program, modeled on military "boot camps," lasts only twenty weeks and is highly structured and restrictive.[2] Only inmates who meet certain criteria may participate.[3] And importantly, inmates who participate in the program earn the benefit of a potentially substantial sen-

---

1. Although Blagman has since been released from SDC, thus mooting his claims for injunctive relief, his claim for monetary damages remains. *See Williams v. Griffin*, 952 F.2d 820 (4th Cir.1991) (holding that inmate's transfer mooted claims for injunctive and declaratory relief, but that claims for monetary damages were not moot); *Taylor v. Rogers*, 781 F.2d 1047, 1049 n. 1 (4th Cir.1986) (same).

2. The creation of the military-style Detention Center Incarceration Program as an alternative to traditional incarceration was authorized pursuant to Virginia statute. *See* Va. Code §§ 19.2–316.2, 53.1–67.8. *See also* Va. Code §§ 19.2–316.1, 19.2–316.3, 53.1–67.1, 53.1–67.7 (authorizing and establishing requirements for the Boot Camp Incarceration Program and the Diversion Center Incarceration Program as related alternative programs).

3. A description of the SDC program referral process is found in a brochure submitted by defendants as an exhibit:

    Referrals to the program are made following a conviction or at a revocation hearing, but prior to the imposition of sentence. There is a sixty (60) day admissions evaluation period. After confirming non-violent status, the Probation and Parole Office will complete or have completed the medical background forms. These forms along with the most recent Pre/Post sentence report are to be forwarded to the Detention Center. The referral will be screened by Detention Center staff. Upon review and evaluation, the Detention Center staff will respond to the District with either a rejection letter or an acceptance letter noting the entrance date. The Court will be notified of the acceptance into the program and if the Court accepts the recommendation, the Judge will impose the sentence[,] suspend the sentence and place defendant on probation conditioned upon successful completion of the Detention Center Program. Detention Center staff will coordinate transportation of the defendant to the Center on the day of intake.

    *See also* Va.Code § 19.2–316.2(3). According to the brochure, only inmates who meet the following criteria are eligible for the program: [1.] Non-violent male offenders (19.2–316 Code of Virginia) otherwise sentenced to incarceration who require greatly increased levels of supervision where other less restrictive interventions may not be effective ([N]ew [C]onvictions). ▉ Those for whom a suspended sentence would otherwise be revoked after a finding that the offender has violated the terms and conditions of probation ordered for a non-violent felony offense (Probation Violators). [3.] Must be physically able to work and participate in limited organized physical activity on a daily basis, i.e., marching and drilling.

tence reduction.[4] Program participants, known as "detainees," are expected to work daily and to complete educational and treatment programs. Additionally, lifestyle is highly regimented; no special dietary provisions are made for any detainee, and none are permitted to own religious paraphernalia other than a Bible, a Talmud, or a Koran.

A fundamental part of the SDC program is an intensive daily schedule. Pursuant to this schedule, a typical day for a detainee at SDC includes twenty-nine separate events, such as rising at 5:30 AM, physical training, reveille and flag raising, three meals, three sessions of programs, treatment, or education, and flag lowering. Detainees have only fifty minutes of personal time between 9:00 PM and 9:50 PM, followed by a ten minute hygiene inspection. Taps and lights out occur at 10:00 PM.

In response to Blagman's complaint, defendants have filed a Motion for Summary Judgment. Blagman has replied by filing his own Motion for Summary Judgment.[5] Somewhat inconsistently, he also contends that summary judgment is untimely because discovery has not yet occurred. Although he alludes generally to potential witnesses and documents, he has neither described in detail the discovery he believes is necessary, nor indicated by affidavit that without specific discovery he is unable to present essential facts in opposition to defendants' motion. *See* Fed. R.Civ.P. 56(f). Because Blagman has failed to specify the discovery needed and because the current record adequately sets forth the requisite facts and legal arguments, this matter is now ripe for summary adjudication.

## II.

The principles governing disposition of summary judgment motions are well-established. On a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the non-moving party. *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985), *overr'd on other grounds, Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *see also United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, "the mere existence of some alleged factual dispute between the parties will not

---

4. This is evident from the following: (1) Eligible offenders may face sentences involving significant periods of incarceration, as several of the qualifying non-violent felonies, as defined by Va.Code § 19.2–316.1, carry maximum sentences as long as five years or more. (2) Yet, eligible offenders who successfully complete the twenty week SDC program are then released, subject only to probation. The other side of the coin is that program participants who voluntarily withdraw from the program, as they may, or who otherwise fail to complete the program, remain subject to their original sentences.

5. Blagman was advised of his right to respond to defendant's Motion for Summary Judgment within thirty days. Though he did not file all of his responsive materials within this period, he has provided good cause for the delay and his filings are deemed timely. After Blagman responded, defendants filed a pleading construed as a motion to amend their summary judgment motion to include the defense of qualified immunity. So construed, the motion will be granted pursuant to Fed.R.Civ.P. 15(a).

defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only factual disputes that "might affect the outcome of the suit under governing law will properly preclude ... summary judgment." *Id.* at 248, 106 S.Ct. 2505. And finally, where the non-moving party bears the burden of proof at trial, as here, "[R]ule 56(e) requires the non-moving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. It is through the lens of these principles that Blagman's claims must be examined.

### III.

#### A. *Equal Protection Claim*

Blagman has claimed that Muslim inmates were treated differently from Christian inmates in violation of the Equal Protection Clause. Specifically, he claims that Christian inmates were favored through (i) the use of better venues for religious services, (ii) the availability of a greater selection of religious books in the SDC library, and (iii) official observances of Christmas and Thanksgiving, without similar observances of Ramadan, a Muslim holiday.

■ The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. To succeed on an equal protection claim, a plaintiff must show at the outset that: (i) he was treated differently from others (ii) who were similarly situated and (iii) that such unequal treatment was the result of intentional or purposeful discrimination. *See McGlothlin v. Murray,* 993 F.Supp. 389, 406 (W.D.Va.1997).

In assessing whether there exists any constitutionally relevant disparate treatment, it is important to keep in mind that the Equal Protection Clause does not command identical treatment; the constitution does not require that prison officials provide identical facilities, personnel, or opportunities for all religious sects. Instead, the Supreme Court has made clear that it is constitutionally sufficient in the prison context for prison officials to provide inmates belonging to various religions a "reasonable opportunity," consistent with valid penological concerns, to practice their religion, and that this opportunity must be "comparable" to the opportunities afforded inmates belonging to mainstream religions. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972).

■ In the event a threshold showing of constitutionally significant disparate treatment is made, the next step in the analysis is to determine whether any such disparity is warranted in the circumstances. *See McGlothlin,* 993 F.Supp. at 406. Ordinarily, where a disparity in treatment impinges upon a fundamental right, the inquiry "sharpens to determine whether the classification or disparity is narrowly tailored to serve a compelling government interest." *Id.* (citing *O'Bar v. Pinion,* 953 F.2d 74, 81–82 (4th Cir.1991)). In the prison administration context, however, prison regulations need only survive a reasonableness inquiry, not strict scrutiny.[6] Put another way, it is settled that the constitution allows reasonable restrictions on prison inmates' religious practices

---

**6.** *See Washington v. Harper,* 494 U.S. 210, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (reasonableness standard applies whenever the needs of prison administration implicate constitutional rights); *Turner v. Safley,* 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (laying out a four factor test for determining reasonableness in the prison context).

This is so because the constitutional rights of prisoners—limited by the fact of incarceration itself and by valid penological objectives— must be balanced against the recognition that it is prison authorities who are best equipped to make difficult decisions regarding prison administration. *See Ali v. Dixon,* 912 F.2d 86, 89 (4th Cir.1990).

where the restrictions are supported by valid penological concerns. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

■ These settled principles, applied here, compel the conclusion that Blagman's equal protection claims fail. To begin with, Blagman and defendants agree that Christian and Muslim inmates were afforded essentially equal opportunities for religious services in separate locations at the same times and that both groups of inmates were subject to the same daily boot camp regimen and schedule. While Blagman has argued that the space offered Muslim inmates was inferior to that offered Christian inmates, the record reflects that defendants addressed this situation as a result of Blagman's complaints. Specifically, in response to Blagman's complaints, Muslim inmates were authorized to hold their religious services in quieter and less crowded spaces.[7] Blagman raises no claim that *these* spaces are inadequate or inferior to those used by other religions. Moreover, it is undisputed that an exception to the SDC schedule was made permitting weekly Islamic study sessions for two hours on Friday afternoons with an Imam, a congregation leader, and that Blagman attended these sessions. In these circumstances, Blagman's equal protection claim must fail, for this record reflects that defendants afforded Blagman reasonable opportunities for pursuing his faith which were comparable to those afforded to Christian inmates. *See Cruz*, 405 U.S. at 322, 92 S.Ct. 1079.

■ A further factual issue that is more apparent than real is whether Christian inmates have access to wider varieties of literature in the SDC library. There is essentially no record on this issue apart from the allegation; Blagman has not identified or specified the literature alleged to constitute this imbalance, nor have defendants responded to this claim. There is therefore no triable issue of fact with regard to library literature. Moreover, the law does not require prisons to ensure that their libraries adhere to numerical parity in books congenial to various religions. *Id.*, at 322, 92 S.Ct. 1079. Therefore, this claim, too, fails.

Blagman's final and principal equal protection claim focuses on the alleged observance of Thanksgiving and Christmas at SDC. In essence, Blagman asserts Christian holidays were observed through special meals, decorations, and activities, while defendants respond that no special, religious meals were provided and that any activities were essentially secular.

It is important to note that on the question of holiday observances, the record, in significant measure, is free of material dispute. Thus, the record does not reflect any claim or evidence that these holiday observances included religious services or prayers. Also, there is no dispute among the parties that certain events occurred on Thanksgiving and Christmas, namely, the meals, the films, and the discussions.[8] Where the parties diverge on this issue is whether these events were secular in purpose or intended to favor one religion over another.

■ Blagman's claim of disparate treatment in holiday observances also fails because any differences in treatment were not the result of purposeful discrimination, but instead were justified as reasonably

---

7. Following Blagman's request on December 30, 1998, defendant White advised him that services could be held on Tuesday, Wednesday, Thursday, and Sunday in the visiting room or in the dining hall in the event the visiting room was not available.

8. The record reflects that the film shown inmates at Christmas was the classic "It's a Wonderful Life," which Blagman contends is burdened with Christian overtones. The record shows the film was followed by a group discussion, not on religion, but on such topics as personal accountability, responsibility, obligations to others and moral obligations generally.

related to the legitimate penological objectives of the facility.[9] This is apparent from a brief comparison of the Christmas and Thanksgiving observances at issue and what might be involved in a Ramadan observance. The SDC Christmas and Thanksgiving observances, as the record reflects, were limited to a single meal, which involved no special religious diet, plus a movie and group discussion. As such, these observances had no significant adverse impact on the SDC program and regimen. By contrast, Ramadan,[10] which typically lasts a month, may require that inmates be permitted to deviate from established meal times by fasting during daylight hours and then receiving special meals after sundown. These and other aspects of Ramadan are irreconcilably inconsistent with the structure and regimen of the SDC program; their observance by Muslim program participants would eviscerate the program and frustrate attainment of its objectives.[11]

To be sure, the restrictive daily schedule at SDC may have a disparate impact on Muslim inmates, whose religion tends to require more rigorous ritual observances than does conventional Christianity or Judaism. Put differently, the traditional requirements of Christian worship, such as weekly services and periodic prayer, tend to be less time-consuming and disruptive of the SDC program than the requirements of Islamic worship, which involves group services, prayers five times per day, and strict dietary restrictions. Although both Christian and Muslim inmates are given comparable opportunities to practice their religions, the Muslim religion's more rigorous requirements may mean that SDC's boot camp regimen has a disparate impact on Muslims. Yet, the Supreme Court has never held that a prison regulation's disparate impact on an inmate's unconventional religious practices is constitutionally significant. *Cf. Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (holding that disproportionate impact, standing alone, was insufficient to prove unconstitutional racial discrimination). Nor is this surprising; a contrary rule would be impractical, if not impossible to implement, as well as rife with potential for abuse by imaginative inmates.

■ Blagman's claim with regard to SDC's Thanksgiving and Christmas observances is better viewed, on closer scrutiny, not as one for impermissible disparate treatment, but rather as one for violation of the First Amendment's Establishment Clause.[12] So viewed, the claim is meritless. Settled First Amendment jurisprudence holds that observ-

---

**9.** *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citing *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)); *Shaheed v. Winston*, 885 F.Supp. 861, 869 (E.D.Va.1995) (plaintiffs must provide evidence that a "discriminatory purpose" was a motivating factor in the defendants' actions); *cf., Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (stating that discriminatory purpose "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group"); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (holding that the historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes," is significant in determining discriminatory intent).

**10.** In Islam, Ramadan is the ninth month of the Muslim year, "during which all Moslems must fast during the daylight hours. Indulgence of any sort is forbidden during the fast. There are only a few who are exempt, e.g., soldiers and the sick." *See* The Columbia Encyclopedia 2275 (1993).

**11.** For examples, the parties agree that SDC rules allow for no special dietary provisions and make attendance at meals mandatory. Defendant explain that this is done to insure that all inmates are eating and to monitor, presumably for health and safety reasons, those inmates who may not be eating.

**12.** "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend I, cl. 1.

ances of such traditional holidays as Christmas and Thanksgiving do not rise to the level of violations of the Establishment Clause.[13] In essence, the law has come to recognize that many typical Thanksgiving and Christmas holiday observances are essentially secular in nature.[14]

Of course, a different result would obtain were the record to show, as it does not, that the holiday observances in issue included religious services or prayers sponsored or required by prison officials. *See Sante Fe Ind. Sch. Dist. v. Doe,* —— U.S. ——, 120 S.Ct. 2266, 2275, 147 L.Ed.2d 295 (2000) ("[T]he Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise. . . ."). Accordingly, prison officials must exercise care to ensure that traditional holiday observances do not cross the constitutional line dividing secular, cultural events and impermissible, coercive religious ceremonies or observances.

### B. *First Amendment Claim*

Blagman's second claim alleges that his First Amendment right to free exercise of his religion was violated because he could not freely perform all required Islamic observances, including the rituals and requirements of Ramadan.

■ Although incarcerated, a prisoner still "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Generally, a prisoner's sincere desire to practice a religion may be restricted only upon the showing that the restriction is reasonably related to legitimate penological interests.[15] And, in determining whether stated penological interests are legitimate, courts should defer to the expertise of prison officials, for "evaluation of penological objectives is committed to the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" *O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400 (citations omitted); *see also Sweet,* 529 F.2d at 863 (upholding prison policy of forbidding pris-

---

13. *See American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 271 (7th Cir. 1986) ("There is nothing distinctively Christian about reindeer, Santa Claus, gift-giving, eggnog, tinsel, toys, retail sales, roast goose, or the music (as distinct from the words) of Christmas carols."); *Ganulin v. United States,* 71 F.Supp.2d 824 (S.D.Ohio 1999) (holding that establishment of Christmas Day as legal public holiday did not violate Establishment Clause); *Torricellas v. Poole,* 954 F.Supp. 1405 (C.D.Cal.1997) (inmate's First Amendment rights not violated by Christmas party). *Cf. Bridenbaugh v. O'Bannon,* 185 F.3d 796 (7th Cir.1999) (holding that recognition of Good Friday as a legal holiday did not violate Establishment Clause); *Cammack v. Waihee,* 932 F.2d 765, 780 (9th Cir.1991) ("the mere calendar recognition of a holiday would [not] have the effect of endorsing the religion."); *Florey v. Sioux Falls School District,* 619 F.2d 1311, 1317 & n. 5 (8th Cir.1980) (holding that much of the art, literature and music associated with traditional holidays, particularly Christmas, has acquired a significance which is no longer confined to the religious sphere of life).

14. *See, e.g., Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 579 & n. 3, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ("[C]ultural aspect of Christmas in this country exceeds the theological significance."); *Lynch,* 465 U.S. at 680, 104 S.Ct. 1355 (holding that the display of a creche as a part of a public Christmas display, "depicts the historical origins of this traditional event long recognized as a National Holiday."). *See also Elewski v. City of Syracuse,* 123 F.3d at 55 (concluding that a creche did not violate Establishment Clause because it was displayed alongside a variety of religious, secular, and mercantile symbols associates with the season).

15. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Ali v. Dixon,* 912 F.2d 86 (4th Cir.1990); *Sweet v. South Carolina Dep't of Corrections,* 529 F.2d 854 (4th Cir.1975); *Howard v. Smyth,* 365 F.2d 428 (4th Cir.), *cert. denied,* 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966).

on inmates in protective custody from attending group religious services).

■ The application of these principles to the instant record compels dismissal of Blagman's free exercise claims. The record reflects that Blagman was allowed a reasonable opportunity to practice his faith that was comparable to the opportunities offered inmates of other faiths. Specifically, he was allowed to possess a Koran and to participate in group religious services and a weekly study session with an outside Imam. While it is true that the SDC program regimen did not allow him the latitude to perform all customary or required Islamic observances, including Ramadan rituals, these restrictions on Blagman's religious practices were of quite limited duration (20 weeks) and reasonably related to the legitimate penological needs of the SDC program. There is no doubt that, as the defendants argue, inmate observance of Ramadan, with its requirements for month long daytime fasting, multiple daily prayers and special diets, is wholly incompatible with the SDC boot camp regimen. There is likewise no doubt that the effective implementation of the program for all participants is a valid penological concern and objective. It follows, in summary, that defendants did not violate Blagman's First Amendment rights by implementing a twenty week boot camp program designed to aid in the rehabilitation of eligible inmates, even though the program had the incidental effect of precluding Blagman from engaging in religious rituals or practices that are inconsistent with the program's regimen. *See, e.g., Employment Division v. Smith,* 494 U.S. 872, 892, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (holding that facially neutral laws or acts of general applicability do not violate the First Amendment merely because of their incidental effects).

C. *Intimidation Claim*

Blagman's third claim alleges that SDC officials intimidated Blagman and other Muslim inmates from filing grievances. This claim fails both factually and legally.

The record reflects that SDC has no formal grievance procedure; instead, confidential request forms are used for this purpose. The record also reflects that Blagman used these forms to complain frequently about the lack of opportunity for Islamic worship and that defendants responded to these complaints by permitting Islamic study or services during the same times as Christian services, allowing Islamic worship in the quieter visiting room if the space was available, and directing treatment and security staff to schedule and arrange Islamic study sessions. This factual record falls short of establishing any effort to prevent airing of Muslim inmate grievances.

■ Moreover, Blagman's claim is as infirm legally as it is factually. Blagman claims that his constitutional rights have been violated because he and other Muslim inmates were intimidated from filing grievances. Yet, state inmates have "no [constitutional] entitlement to grievance procedures or access to any such procedure voluntarily established by a state." *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994), *cert. denied,* 514 U.S. 1022, 115 S.Ct. 1371, 131 L.Ed.2d 227 (1995) (citations omitted); *Mitchell v. Murray,* 856 F.Supp. 289, 294 (E.D.Va.1994). Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991); *accord Adams,* 40 F.3d at 75; *Sandin v. Conner,* 515 U.S. 472, 489 n. 11, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). A prison's refusal to entertain such grievances does not compromise an inmate's constitutional rights, as access to the courts would still be available. *See Scott v. Kelly,* 107 F.Supp.2d 706 (E.D.Va.2000). Thus, even if Blagman's allegations are taken as true, the fact that Muslim inmates were intimidated from filing grievances does not state a cognizable constitutional claim because the lack of a grievance process causes no

injury to their constitutional right of access to the courts. *See Tucker v. Angelone,* 954 F.Supp. 134, 136 (E.D.Va.1997). In any event, the factual record flatly contradicts any claim of intimidation. Accordingly, Blagman's claim in this regard fails as well.

## IV.

For the reasons stated above, defendants' Motion for Summary Judgment will be granted and Blagman's complaint dismissed. As judgment may be entered based on the facts, there is no need to review defendants' assertion of qualified immunity. An appropriate Order will issue.